<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                            MARSHALL DIVISION

 3

 4   LINEX TECHNOLOGIES            )
                                  )     DOCKET NO. 2:07cv222
 5                                )
          -vs-                    )
 6                                )     Tyler, Texas
                                  )     1:30 p.m.
 7   BELKIN INTERNATIONAL, ET AL  )     September 17, 2008

 8

 9

10
                          TRANSCRIPT OF MOTION HEARING
11                    BEFORE THE HONORABLE JOHN D. LOVE,
                          UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16   COURT REPORTER:          MS. SHEA SLOAN
                              211 West Ferguson
17                            Tyler, Texas  75702
                              903/590-1176
18

19
     Proceedings taken by Machine Stenotype; transcript was
20   produced by a Computer.

21

22

23

24

25
</pre>

```
1                          SIGN-IN SHEET

2    PLAINTIFF ATTORNEYS              REPRESENTING

3    ED GOLDSTEIN                     Linex
     STEVE ABBOTT                     Linex
4    JOHNNY WARD                      Linex
     CORBY VOWELL                     Linex
5


6
     DEFENSE ATTORNEYS                REPRESENTING
7
     SAM BAXTER                       Cisco-Linksys
8    GARRET CHAMBERS                  Cisco-Linksys
     DARRYL BURKE                     Cisco-Linksys
9
     DAN CONRAD                       Dell, Inc.
10
     DARREN P. MAREMISS               Gateway, Inc. and Lenovo
11   ERIC FINDLAY                     Gateway, Inc. and Lenovo

12   ANDY STINSON                     Phoebe Micro

13   BRIAN RANGE                      Netgear

14   ROBERT MATTSON                   Buffalo
     BILL CORNELIUS                   Buffalo
15
     IRFAN LATEEF                     Toshiba America
16   CHERYL BURGESS                   Toshiba America
     MELVIN WILCOX                    Toshiba America
17   TREY YARBROUGH                   Toshiba America and Belkin

18              *********************

19   ALSO PRESENT:  JOE GARODNICK - LINEX CORPORATE REP. AND
                                     AFFIANT
20              MARK MICHELS - CISCO IN-HOUSE COUNSEL

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Ms. Morris, you may call the case.

4              THE CLERK:  The Court calls Case No. 2:07cv222,

5    Linex Technologies v. Belkin International, et al.

6              THE COURT:  Announcements.

7              MR. GOLDSTEIN:  Your Honor, for plaintiff Ed

8    Goldstein.  With me are Johnny Ward, Ward & Smith; Corby

9    Vowell and Steve Abbott of Goldstein Faucett and Prebeg, and

10   we have brought Dr. Joe Garodnick, who is a principal at Linex

11   and the affiant in this matter.

12             THE COURT:  All right.  Good morning.  For the

13   defendants?

14             MR. BAXTER:  Good morning, Your Honor.  Sam Baxter,

15   McKool-Smith.  I have with me Garret Chambers and Darryl Burke

16   and from Cisco, Mr. Mark Michels back in the courtroom.  We

17   are ready.

18             THE COURT:  All right.

19             MR. CONRAD:  Good morning, Your Honor, Dan Conrad

20   from Jones Day.  I am here for Dell, Inc.

21             THE COURT:  Okay.

22             MR. FINDLAY:  Okay.  Good morning, Your Honor, Eric

23   Findlay for Gateway and Lenovo and also with me is Darren

24   Maremiss from Dechert in Austin.

25             THE COURT:  Okay.

1          MR. STINSON:  Your Honor, Andy Stinson here for

2     Phoebe Micro.

3          MR. RANGE:  Good morning, Your Honor.  Brian Range

4     here for Netgear.

5          MR. CORNELIUS:  Good morning, Your Honor, Bill

6     Cornelius and Robert Mattson for Buffalo Technology.

7          MR. MATTSON:  Good morning.

8          THE COURT:  Good morning.

9          MR. YARBROUGH:  Your Honor, Trey Yarbrough for

10    Belkin and D-Link; and myself, Trip Wilcox, Irfan Lateef and

11    Cheryl Burgess for Toshiba.

12         THE COURT:  Good morning.  All right.  Everybody

13    made their announcements?  Full house today.  All right.

14    Well, we are here on this motion to compel infringement

15    contentions.  Let me go ahead and ask the defendants if they

16    would take up their motion.  Of course, I have read the

17    material, seen the affidavits, so, you know, I would just urge

18    everyone to get to their points and not go -- I don't think it

19    is necessary to go too much into the background or the

20    technology, although I think that would be helpful to some

21    degree.  I will have questions for you as we go.  Let me just

22    go ahead and hear -- I guess -- who will be arguing the

23    defendants' motion.

24         MR. BAXTER:  Your Honor, Mr. Burke is going to argue

25    collectively for the group.

1          THE COURT:  All right.

2          MR. BAXTER:  Some others may want to chime in later,

3     but I think he is going to take the lead.

4          THE COURT:  All right.  Mr. Burke, why don't you go

5     ahead.

6          MR. BURKE:  Thank you, Your Honor.  May it please

7     the Court.  Again, I am Darryl Burke.  I am here for all of

8     the defendants in this case.  Right off the bat I want to

9     answer the question why we are here today.  We are here today

10    to ask for you to strike the infringement contentions of the

11    plaintiff in this case.  We recognize this is an extraordinary

12    form of relief.  In this case I think our briefs are plain,

13    and I am happy to talk about them today, and we think it is

14    more than appropriate in this case.

15         One thing I have learned about practicing law here

16    in the Eastern District for more than 10 years is that the

17    rules mean things.  That the rules in the district in general

18    puts a high premium on preparedness, particularly on the

19    plaintiffs but also on the defendants -- on both parties

20    really to not play any games so the issues can be arrived upon

21    so the parties can prepare their case so they can reach a

22    settlement if that needs to be or at least reduce the cases or

23    the issues that need to be decided for the Court.

24         In this case it just once again with regard to the

25    rules I think it is important to focus on the rules at issue.

1   We are talking about I would say 3-1 infringement contentions.

2   I was reading this last night again. It is (b), (c) and (d)

3   of that rule. I was kind of struck how many times in this

4   rule that the word "each" is used. For instance, if you use

5   3-1(b) the rule says, "Separately for each asserted claim,

6   each accused apparatus, product, device, process, method, act,

7   or other instrumentality of each opposing party of which the

8   party is aware. This indication shall be as specific as

9   possible. Each product, device, or apparatus must be

10  identified with the name or model number if known. Each

11  method or process must be identified by the name, if known, or

12  any product, device, or apparatus which, when used, allegedly

13  results in the practice of the claimed invention.

14          (c) again mentions the word "each" four more times.

15  In fact in there if you ask for a chart identifying

16  specifically, specifically where each element of each

17  asserted claim is found within each accused instrumentality.

18  It goes on to say with respect to each element that the party

19  contends in 112(6) you have to identify the structures, the

20  materials that perform the claim function.

21          (d), which I won't read again speaks about the

22  doctrine of equivalents. It mentions the word "each" again.

23          In this case the charts that the plaintiffs served

24  over six months ago, you know, basically they sued just as a

25  background -- this is an industry lawsuit. They have sued ten

 1    defendants.  They have sued an entire industry for violation

 2    of this '322 patent, and they have identified I think 68

 3    different products.

 4         In their infringement contentions that they gave us

 5    they essentially gave all ten of us the exact same chart.  In

 6    fact, it has the exact same typo in the chart.  It is only a

 7    matter -- I think I have the one for Cisco in my hands here.

 8    It is less than ten pages, the entire contention.  If you look

 9    at the chart for any one claim of the four they have asserted,

10    I mean it is at most two pages, two pages in length.

11         Now, there is no supporting materials.  There is no

12    reference materials.  There is no explanation.  They don't

13    even bother to tell us which generic product or which

14    exemplary product this chart is based upon.  And this is

15    important, Your Honor, because in this case they have sued a

16    whole variety of products.  They have sued -- they have sued

17    PC manufacturers, laptops, the desktops, they have sued router

18    manufacturers.  They have identified the product numbers of

19    routers, of PC cards, of adapters.  That is at least five

20    different categories of products.

21         Some of the products comply with this 802.11n

22    standard.  Some do not, which I am not sure at the point they

23    fully appreciated when they identified the list.  There are no

24    pictures.  There are no block diagrams.  Even the most

25    simplest of elements and with the antennas -- which we are not

1    disputing that there are not antennas in these wireless

2    devices; but they don't even bother to explain or identify

3    where the antennas are found or which ones are at issue.  That

4    is important for some of the defendants because not all of the

5    antennas may be used all of the time.

6          If I might, I don't know if I can be granted

7    permission to show you, I don't know if you have seen one of

8    these products.  If I can approach, I would like to show you.

9          THE COURT:  All right.

10          MR. BURKE:  This is a router, Cisco router, one of

11   the accused products.  I'm sure the number is on here, but it

12   says on the back of this.  Any objection?

13          MR. GOLDSTEIN:  No.

14          MR. BURKE:  Here is the box of materials.  In fact,

15   I have gone ahead and taken the liberty.

16      (Exemplar given to the Court.)

17          There are four screws that were required to open up

18   that particular router device.  As you can see from what is

19   there and what is evident on that router device is a printed

20   circuit board, which is the green part and then there is a

21   whole series of microchips, the bigger square boxes and black

22   boxes there and a whole bunch of other electrical components.

23   The point that is interesting here a lot of the information

24   they now claim that they need was all available to them had

25   they bothered to go down to Best Buy or get on Amazon or go

1    down to Sam's and "bluelight special" and buy those products.

2    That product there sells for about $100.  Some of the products

3    are as cheap as forty or $50.  The laptops are $500 or $800.

4    That said, they could have bought in this case every single

5    one of the products that they have alleged infringe

6    their patent for less than $10,000, and I am including sales

7    tax in there.

8          This particular invention isn't an oil and gas

9    invention that is buried down in the ground somewhere.  It is

10    not in the cockpit of a 747 or on a battleship.  It is not a

11    million dollar piece of equipment they don't have

12    ready access to.  This is something they could buy down at

13    Best Buy.  From that information there having done a whole

14    bunch of infringement contentions in my life, you know, what

15    you do when you do these kind of things is you go down to the

16    store, you buy the device, you take it apart, you look at

17    the chip numbers that are there, then you go to chip numbers

18    and go to the website.

19          For instance, those that are right there on

20    that device, I think are Broadcom or two or three of the

21    chips.  I believe there is an EON and others.  You go to the

22    website and you type the number of the chips on the website,

23    you can pull up whatever technical information exists.  I will

24    be honest with Your Honor, some of these websites have more

25    technical information than others.  They used to have very

1    complex data sheets.  Now they tend to be a little bit

2    shorter.  Other websites I noticed from reading the other

3    defendants' affidavits actually have source code and a fair

4    amount of detailed information.

5           You can go to the manufacturer or the branded

6    provider of that.  For instance, that is a Linksys product.

7    You can go to the Linksys product and pull down the user

8    manual.  That is significant, Your Honor, because actually one

9    of the features that you asked about in your order last week

10   can be disabled and the user manual actually tells you how to

11   go ahead and do that.

12          From that information you can construct some sort of

13   contention, some sort of presentation.  In this case they have

14   run after they have asserted these infringement contentions,

15   and I note just for completeness the only time they mentioned

16   802 -- IEEE 802.11n standard is really as an adjective.  Your

17   know, it is an 802.11n transmitter, you know, these kind of

18   uses.  They did not in their original infringement contentions

19   cite the standard at all in terms of the device and the

20   specification by section number by page number, by figure.

21   They didn't give us their version, they didn't give us the

22   release, or any of that.  I have actually a copy.  I mean,

23   this is the standard, double-sided.  It is over 500 pages

24   long.  As I think you can tell even they admitted in Mr.

25   Garodnick's affidavit there is at least 40 or 50 different

1  possible, you know, variances in the configurations.  We think

2  the number is much, much higher.

3          After we started discussing this issue and then in

4  their brief they have now narrowed it down to at least ten

5  pages, Your Honor, but they still at this late date, six

6  months after they were supposed to provide this information, a

7  year and a half after they sued, they still haven't provided a

8  detailed explanation of how any part of these ten pages

9  satisfy the claim limitations.  That is particularly

10 interesting.  We don't think they can.  The reason we don't

11 think they can is because, as we have said and now given you a

12 sworn affidavit to support, this doesn't speak to the received

13 portion of wireless systems.  Whatever it does say about the

14 received portion isn't relevant to the claimed invention.

15         Even the chart that they put in their brief, I might

16 add, which was not in their original contention that is shown

17 here is a Figure N-64 is a transmitter block diagram.  There

18 is no corresponding receiver block diagram.  That is important

19 because if you look at the claims in their claims, all of them

20 they have received elements --

21         Strike that.

22         They have transmit elements that transmit a signal

23 that are received by another device, you know, after bouncing

24 around the air a little bit.  So you have three of the

25 elements, you know, are transmit related and three of the

1  elements are received.  What do you do after you get -- after

2  the receiver receives that device?  What is interesting is the

3  device that you have there only does one of those things at a

4  time.  So if that device that is on your desk up there on the

5  Bench is talking to a laptop, that is transmitting the signal

6  and it is being received over here by one of the laptops, one

7  of the cards inside one of the laptops.  Then in turn that

8  laptop is retransmitting a different signal back to the

9  router, which is a receive device.

10  So the claims require both halves together, and they

11  haven't even rebutted that argument.  Yet they have accused

12  all these products at best at any one time only do half, half

13  of the claimed invention.  So we think that they have fallen

14  short in that way as well.  It is particularly troubling, Your

15  Honor, in view of the interrogatory that we asked them very

16  early on in this case, we asked them -- defendants' interog

17  12, Interrogatory No. 12 we asked Linex, "To describe the

18  testing, the reverse engineering, or analysis of any accused

19  products and describe the results."

20  Now, in response Linex admitted -- and I am reading

21  now directly from their answer.  "Linex did not reverse

22  engineer any of the accused products period.  Rather, Linex

23  based its decision to bring this lawsuit after consulting with

24  counsel, following the review of defendants' product

25  literature and data sheets related to the defendant's products

1 that state explicitly that such products use MIMO technology

2 or operate in compliance with the IEEE draft 802.11n standard.

3 It was evident from the defendants' representations within

4 these materials that the defendants infringed the '322 patent.

5 Additionally, we became aware of defendants' involvement in

6 selling --

7 THE COURT: Mr. Burke.

8 MR. BURKE: -- the --

9 THE COURT: Mr. Burke.

10 MR. BURKE: -- deploying products.

11 THE COURT: Mr. Burke, you are going real fast.

12 MR. BURKE: I'm sorry. I get -- I get kind of

13 excited here this morning.

14 THE COURT: The court reporter may --

15 MR. BURKE: Appreciate --

16 THE COURT: -- appreciate a little bit slowing down.

17 MR. BURKE: I appreciate the breath.

18 THE COURT: Yes, good for you, too.

19 MR. BURKE: "Additionally, Linex became aware of

20 defendants' involvement in selling and deploying products

21 implementing the IEEE draft 802.11n standard, or otherwise

22 utilizing MIMO technology, and their infringing conduct."

23 This is it over here. "After researching and reviewing the

24 defendants' websites and various trade journals."

25 So we know from Linex's answers to our interrogatory

1   if they did buy a product they never reversed a single

2   product.  They have sued the entire industry 68-plus products

3   and they didn't buy a $100 piece of product and didn't take it

4   apart and didn't test it and didn't do what I have just done,

5   you know, given it to you and taken it apart.

6           THE COURT:  What they are going to say is, I think

7   in part, the plaintiff is going to say -- you know this -- is,

8   well, we need the software, we need the internal workings.  I

9   mean, you know, we look at this and it is what it is.  But

10  that is not going to give us the answer that we need to

11  provide you, so we need your proprietary information, your

12  software.  And that is where -- I think in part where they are

13  coming from.  How do you respond to that?

14          MR. BURKE:  Two responses.  One, is they have not

15  made it very easy for us to even request that software.  Most

16  of -- as we understand the case this is really wrapped up in

17  the chips, those little black -- in the circuit board.  We I

18  think collectively here we either buy those directly or

19  indirectly from a number of manufacturers.  In fact, we have

20  identified that to them.  It is kind of a secret that is

21  hidden out in plain view because all they had to do was buy 68

22  products and they could've figured out who all the chip

23  manufacturers are.  They can go to the websites and figure out

24  what those chips do.

25          So one is -- at least when they do one of these

1    infringement charts, again having done several of these, they
2    need to go through and explain what component, what subsystem
3    within each accused device performs the recited limitation.
4    It may be one chip, it may be more than one chip.  Right now
5    based upon what we have, we don't know.  And this makes it
6    very difficult for us for a number of reasons.  Let me
7    explain.  You know, one, is if you go back to the chip
8    manufacturers as we have and said, you know, we think that we
9    have been sued because of this -- because your chips are doing
10   something wrong.  And they say -- they name our chips in the
11   infringement contentions.  No.  Well, come back to us when
12   they have.  So they haven't made it very easy for us to get to
13   the bottom of this on our side.  We don't even know as we sit
14   here right now what chip manufacturers to go talk to.  They
15   haven't taken even an exemplary product and diagramed it.  So
16   it makes it difficult for us to get our arms around this case.
17          Let me throw you another example.  I believe -- and
18   we have answered this in our interrogatories.  There are seven
19   different manufacturers of chips or chipsets at least.  And we
20   have told the plaintiff in this case that, I think, five or
21   six months ago.  Now, number one they haven't served a
22   subpoena yet on any one of these manufacturers.  Number two,
23   there is at least if you think about it five potential
24   design-arounds that they may exist right now on the table
25   because even Dr. Garodnick admitted the standard doesn't speak

1    to the particular implementation.  It only speaks to the

2    functional definition of that black box.  So the standard

3    doesn't get them there.

4          But if I may drop back.  If they say this is a

5    standard case, then they at least need to explain why it is

6    that the standard if followed, you know, the generic

7    architecture that is in the contention, for instance, is

8    utilized, how that infringes their patent.  And where this is

9    particularly of interest is OFDM and spread spectrum, which

10   you have heard is two modulation schemes.  The standard talks

11   OFDM.  The patent says spread spectrum.  Now, I presume they

12   are going to argue those are the same somehow.  Both of those

13   theories have been around for 20 or 30 years.  It is in

14   textbooks.  I know one of them is in textbooks that the

15   inventor has written.

16         They could at least explain generically why it is

17   that OFDM theory of modulation satisfies the spread-spectrum

18   theory of modulation.  They didn't even have to go --

19   ultimately they would have to go get the particular details,

20   but at the early stage it was in textbooks.  I don't know if I

21   answered your question, I sure tried hard.

22         THE COURT:  No, you did.  Go ahead.

23         MR. BURKE:  The last two points -- and I will be

24   happy to let the defendants -- the plaintiffs speak.  They

25   haven't addressed this joint issue, joint direct infringement.

1   We have talked about do the two systems talk to each other at

2   all.  They seem to be oblivious to the point; therefore, they

3   haven't reached the minimum requirements.

4         Second, they haven't laid out at all in their

5   infringement contentions whatsoever, an indirect theory of

6   infringement, either inducing infringement or contributing to

7   the infringement of another.  That hasn't even been put

8   forth.  So I don't see how they can now back up -- they

9   haven't even responded to that in their brief.  It seems to me

10  at a minimum they have waived that.

11        On the doctrine of equivalents, which, again, the

12  rules require them to come forward with that at the very

13  beginning, all they said in the infringement contentions is

14  that they asserted the claims were literally infringed; that

15  they reserved the right to do that at a later point in time

16  after the claim construction or after discovery litigation.

17  Again, this is information they should have had at the very

18  beginning of the case.

19        Now, one last point.  If the rules mean things

20  anywhere really, there needs to be -- they need to be

21  followed.  There needs to be a consequence for not following

22  them.  They need to have teeth.  And the problem we have at

23  this late juncture -- I mean our claim construction terms need

24  to be exchanged next Friday.  We have been forced to go

25  through this process in the dark.  We have been in that way

1    prejudiced severely.

2         THE COURT:  Let me ask just a practical point here,

3    and we will get -- I want to get into this with the

4    plaintiffs.  But, you know, you talk about -- I understand you

5    are moving to strike their contentions.

6         MR. BURKE:  Yes, Your Honor.

7         THE COURT:  But is there something to be said for

8    the idea that the plaintiff is -- they provided their

9    contentions to you -- now, I don't know what they are going to

10   say whether they are going to say they need this or they need

11   that and we will see about that.  Let's say that is what their

12   contentions are.  Would there be something to be said for,

13   okay, fine, that is what your contentions are.  We are going

14   to file a motion for summary judgment, we are going to get our

15   experts to look at these and put our reports together and we

16   are going to file a motion that is going to explain the things

17   which you have just explained to me, how these contentions are

18   in your mind wholly deficient.  And presumably the plaintiff

19   would be stuck with what they have -- that is their case.

20        So what would your position be on that?  I

21   realize -- let's say the Court disagrees that striking their

22   contentions is not the appropriate way to go here.  What would

23   your position be with regard to that alternative?

24        MR. BURKE:  What I am afraid what would happen if we

25   were to file a motion for summary judgment is we hear much of

1   what we have already heard, this is premature and this is

2   early and we haven't taken discovery in this case and they

3   will get our position and that is all done and they get our

4   expert report.

5         THE COURT:  Let's assume we go through discovery.

6         MR. BURKE:  And we go all the way through the

7   discovery and we have the expert reports, the problem we have

8   is, honestly, we are having difficulty responding to the

9   allegation in the first place for all of the reasons that I

10   have mentioned, the chip guys were not responsive or not

11   helping.  We don't understand how OFDM and spread spectrum is

12   the same thing.  We have the Markman coming up.  We at least

13   need to have their allegations.

14         So I would argue that the rules kind of lay this out

15   in such a way -- they initiated this lawsuit.  They had all of

16   the time in the world to put their case together.  They had

17   another nine months after that, you know, to prepare their

18   formal infringement contentions.  I mean, they should have

19   gone first.  They should have had their ducks in a row and

20   should have done that.  I am afraid, honestly, Your Honor, in

21   direct answer to your question if we do a summary judgment it

22   just kind of moves the ball further down the field without

23   ending this and it costs more money and takes up more time and

24   more resources and more distraction to our plaintiff -- I'm

25   sorry to our clients.  So I hope I have answered that.

1            THE COURT:  Oh, you have.  Okay.  Thank you.

2        All right.  Let me hear from the plaintiff.

3        MR. VOWELL:  Good morning, Your Honor.  Corby

4   Vowell on behalf of Linex Technologies.  I just want to start

5   by saying that on behalf of the plaintiff we take the rules

6   very seriously.  Our firm represents many plaintiffs in this

7   district.  We have been litigating in this district for quite

8   a while and we are well aware of the rules themselves and we

9   take them very seriously, and we did in this case as well.

10           Many of the issues that have been raised today, and

11  I think, Your Honor, is actually kind of heading this

12  direction, but many of these issues that are raised are more

13  like infringement issues than they are issues about whether or

14  not the infringement contentions themselves are sufficient.

15  They are trying to raise noninfringement issues at this point

16  and get into those issues even before claim construction.

17           But let me back up a minute and talk about the

18  infringement contentions.  The plaintiff in this case, we have

19  looked at all of the publicly-available information that we

20  could get our hands on and made a determination as to what was

21  the most reliable information that we could look at, analyze,

22  and then base our infringement contentions.  And in this

23  particular case that is the 802.11n standard that has been

24  described ad nauseam in the papers and in the affidavits as

25  well.

1    If you look at our infringement contentions, you
2    will see that there are numerous references to the standard
3    itself.  The contentions are clear that the standard is the
4    basis for those contentions.  And the fact that the defendants
5    are now claiming they know nothing about our infringement
6    contentions is just -- I don't know what to say about that.
7    They clearly know what we are accusing of infringement.  It is
8    the chips in each of these products that perform the functions
9    according to that standard.  That is where we started, and
10   that is where we are now.  It was clear from the beginning.
11   One of the things that I would like to point out is
12   we have reviewed most of the information -- prior to filing
13   suit we reviewed most of the information that the defendants
14   attached to their affidavits, including the data sheets that
15   were attached.  The issue is that if you break open that
16   product, you figure out what chipset is there, and then you go
17   to the data sheet for that chipset.  I will give you as an
18   example Exhibit C to the declaration.  I forget -- it was the
19   expert opining on behalf of Cisco.
20   The first page is the intensified product brief by
21   Broadcom.  On the second page of that data sheet is a block
22   diagram of that chipset.  The problem is -- and we looked at
23   this information ahead of time and determined whether or not
24   that was enough.  And we said that is not enough.  That is not
25   enough information on that data sheet.  So we have got to go

1   look somewhere else because -- I have highlighted here and I

2   would be happy to bring this up to you.  But there is a few

3   particular blocks in that diagram that perform the functions

4   that are recited in the standard.  But the document itself,

5   the data sheet itself, does not go into those features or

6   functions.  It does not describe how those functions are

7   performed.  The standard itself addresses those.

8           So even if we break open all of the products -- we

9   know this beforehand -- there is a reason why we didn't go

10  through that exercise because we would get to the same point.

11  We would get to the same point, which is we need to know what

12  is in those specific chips, the hardware that is used, if

13  there is any software used we need to know that.  And the best

14  source for understanding that, absent the proprietary

15  documents of the chipset manufacturers is the standard itself,

16  so that is where we start.  I think it is clear if you look at

17  our contentions and if you read the briefing in light of the

18  briefing by the parties, it is clear that both sides know what

19  we are contending meets each element of the claims based on

20  the standard.  We cited to -- even though we did not in our

21  original contentions cite to specific pages of the standard,

22  we did that in a follow-up letter in an effort to try to move

23  things along and not burden this Court with motion practice.

24          Beyond that, we have said on numerous occasions and

25  in writing submitted to the Court that we would -- although we

 1    don't think it is necessary -- we would amend our contentions

 2    once we get through the proprietary information and get access

 3    to the proprietary information for each of these chipsets.  We

 4    are still willing to do that, although we don't think it is

 5    necessary.

 6            So we are doing everything we can to try to prevent

 7    taking up resources from the Court or bothering the Court with

 8    discovery issues that we are pursuing on our own.  So with

 9    regard to issues like the receiver portion, this is something

10    that the defendants have raised a number of times in a number

11    of different ways.  The standard itself does address quite

12    clearly the signals that are transmitted, and it provides at

13    least a guideline architecture but it describes the functions

14    that have to be performed in order to transmit those signals.

15            As one of ordinary skill in the art knows, you have

16    to be able to receive and process those symbols.  You can't

17    just build any receiver you want.  You have to know what the

18    transmitter does, how it is composed, and you have to know how

19    the signals are comprised in order to receive those and

20    process those and understand them and generate the original

21    signal back.  So this issue of, well, the standard does not

22    even address the receiver is just false.  I mean, it addresses

23    the receiver by explaining exactly mathematically how the

24    signal has to be formed so that everybody in the industry can

25    build it and they can build it however they want.  But it is

1   going to have to have the basic functional components

2   necessary to reverse the process that was done at the

3   transmitter.  It is very clear what that process is.  And to

4   say that they don't have any idea what that -- you know, what

5   we are accusing of infringement just doesn't make sense.

6          THE COURT:  Well -- okay.  Let me ask this:  So is

7   it the plaintiffs' contention that their infringement

8   contentions are sufficient as they stand right now?

9          MR. VOWELL:  Yes, it is.

10         THE COURT:  Okay.  So your position would be that

11  you -- in order to provide sufficient infringement

12  contentions, you don't need the proprietary software, firmware

13  information?  In other words, you don't need how these chips

14  operate say in this router that has been presented here this

15  morning?  You don't need that information is your position?

16         MR. VOWELL:  To establish infringement at trial we

17  would like to look at information.  However, for the purposes

18  of providing infringement contentions, putting them on notice

19  of our theories of infringement and showing that the claim

20  elements are met by the accused products, we do not need that

21  information.  The standard provides enough information for us

22  to understand how their products operate.

23         Now, you know, proving that at trial and

24  establishing going through each product at trial sufficient

25  for expert reports and at trial is a different matter, but we

1    believe that the information we provided is sufficient for our

2    infringement contentions.

3         THE COURT:  Well, let me take, for example, this

4    router that has been presented to me this morning.  It has a

5    number of chips within it.  So your position would be that

6    looking at this particular router, for example, and pointing

7    to particular chips that you claim perform particular

8    functions, that would not be necessary here?

9         MR. VOWELL:  We think that the infringement

10   contentions are clear; that it points out that the products

11   themselves have those functions in them; and whether we cite

12   to a specific product number or not, we don't believe that is

13   necessary to put them on notice of what we believe infringes

14   because we have specified that it is the portion of the

15   product that complies with the standard, and they are aware of

16   what portion of the product that is.

17        THE COURT:  Well, I think one of their arguments is

18   that, you know, this standard, while the product you may be

19   addressing complies with the standard, that in their mind does

20   not answer the question of how the product, what it matches up

21   with within the claim.  You know, I think you have accused a

22   number of different products.  And I am concerned that you

23   have not specified what -- how the product performs the

24   particular function -- or within the particular claim element

25   that is being addressed.  I am just not sure I am seeing that.

```
 1          MR. VOWELL:  Okay.  I think one of the things that
 2    is important to understand here is that the claims do not
 3    address all of the internal details and specific parts that
 4    would be resident in the implementation.  The claims are
 5    directed at sort of the overall functions that are performed,
 6    and those functions are described in the standard.  So the
 7    claim elements, for example, demultiplexing is one element
 8    that is in each of the asserted claims.  And the accused
 9    products -- the standard itself describes this process of
10    demultiplexing an incoming stream into multiple spatial
11    streams.  So we have identified -- and that is just one
12    example.  I could go claim element by claim element, but that
13    is one example where the standard itself describes taking an
14    incoming signal, breaking it down into multiple spatial
15    streams, and we have cited that as support for meeting a
16    particular claim element, namely the demultiplexing function.
17          THE COURT:  Well, I am a little bit concerned, Mr.
18    Vowell, about the position that you appear to be taking
19    that -- I certainly don't -- I am not saying that the
20    infringement contentions need to provide every bit of
21    information, establish your case for infringement, you know,
22    that kind of thing.  But at the same time it concerns me that
23    you are saying that there is information there that we are
24    going to need to use at trial; but for the purposes of the
25    infringement contentions with all of these defendants and all
```

1    these particular products, that we don't need to be more

2    specific and specify -- for example, the "n" standard I think

3    which is conceded by the plaintiff that provides for a number

4    of different configurations and modes and it has certain, for

5    lack of a better way of putting it, baseline characteristics

6    that an "n" compliant product would have.  But there are a

7    number of different ways to do that.  So it just concerns me

8    that you are, you know, saying we are going to need all this

9    information but we don't need it now and we can provide sort

10   of a much less specific contention than you are going to need

11   at trial.

12         MR. VOWELL:  I guess maybe to state that better is

13   that the information that we are seeking discovery is really

14   to confirm what we already believe and know has happened.  So

15   I don't know that it is additional information that is

16   necessary to prove infringement.  I guess the better way to

17   state it is it is to confirm what we believe and how we

18   believe these products meet the standard.  I think that is the

19   better way to phrase it, so certainly we believe that by

20   operating according to the standard, they do infringe.

21         And we understand that the standard -- we are not

22   looking at the standard in a vacuum.  There are a number of

23   different modes and possible configurations for a product that

24   is compliant with the standard.  And some of those will be

25   relevant to the claims, some of those are not relevant to the

1  claims.  The product may implement some features that are not

2  relevant to the claims.  And we are sort of not addressing

3  that at this point.  But it is clear to us not only from the

4  standard, but the fact that each of these defendants has gone

5  out to an independent third party, the Wi-Fi Alliance and

6  sought certification not just of the standard itself but of

7  these modes of operation that infringe the claims, we have

8  confirmed that and understand that they do work in accordance

9  with the claims.  And we have described that in our

10  contentions.

11        I mean, again, we are certainly willing to amend,

12  although we think that our infringement contentions are

13  sufficient, we are willing to amend and include certain

14  information that comes from the proprietary information either

15  of the defendants or of third parties.

16        THE COURT:  Let me ask this:  I think that you have

17  accused some products which are non-"n"-standard compliant, in

18  other words they don't comply with the "n" standard, they

19  comply with another standard.  Is that right?

20        MR. VOWELL:  I don't know that they -- they may

21  comply with other standards but in terms of the infringing

22  technology, the MIMO technology that they incorporate, I don't

23  believe that that adheres to any other particular standard, at

24  least the MIMO portion.  So we studied -- in those particular

25  cases -- and most of these are products that either pre-dated

1    the standard by -- pre-dated a draft of the standard by a

2    certain time period or were available -- some of them are

3    still available now, but the 802.11n products are quickly

4    replacing them.

5         But nonetheless, we studied the publicly-available

6    literature on those and the descriptions available with those

7    products and they tracked what was going on in the standard,

8    at least at the level we are talking about.  Again, there may

9    be other specific implementation details that are different

10   between those products and the products that comply with the

11   standard.  But at least as to the elements of the claims the

12   information that is available publicly about those products

13   indicates that they work the same way that the products which

14   comply to the standard do.

15        THE COURT:  Okay.  Explain to me -- you mentioned

16   the MIMO technology.  Now, how does that fit into what is

17   claimed here in the case, in the patent?

18        MR. VOWELL:  Okay.  Some background.  The MIMO

19   technology has -- for many years there have been instances

20   where you try to use multiple antennas and other kinds of

21   things, either add a transmitter or add a receiver, not

22   necessarily together to try to improve the efficiency of

23   communications over a particular channel.  And there is -- as

24   Mr. Garodnick here can attest to, there are -- there is an

25   enormous amount of work that has gone into how can you improve

1    the efficiencies of wireless communications?  This particular

2    technology, which is in its most recent form has been adopted

3    by the standard, involves taking information on the

4    transmission side so the digital signal that is coming in that

5    you want to transmit, breaking it down into multiple spatial

6    streams and then processing that information through a number

7    of things, encoding it basically and spreading that data and

8    then transmitting it over multiple antennas.  And the idea

9    here is to take advantage of what are called multipath

10   effects.  I don't want to get too much into the details here.

11        But the basic idea is that the signals that are

12   transmitted bounce off walls, buildings, other things like

13   that; and then at the receiver end you have multiple antennas

14   that receive those signals and then combine them all back

15   together, demodulate, despread the signals that are coming in,

16   and then combine them back together into the original signal.

17   And for reasons we won't get into here there is an efficiency

18   here that enables a much higher through-put when you break the

19   data down into multiple spatial streams and transmit them and

20   receive them over multiple antennas.

21        THE COURT:  Okay.  So I guess my question is, does

22   the patent teach MIMO technology?

23        MR. VOWELL:  Yes, it does.

24        THE COURT:  Okay.  Now, do the "n" devices accused

25   here utilize MIMO technology?

1          MR. VOWELL:  Yes, they do.

2          THE COURT:  All right.  Now, we talked about this a

3    second ago, but the noncompliant products, the non-"n"-

4    compliant products I guess you say they really are -- I guess

5    what we are trying to get a handle on here is there are "n"

6    standard products that appear and then are they all "n"

7    standard products is what it boils down to that you have

8    accused in the case.

9          MR. VOWELL:  Well, they are not official "n"

10   standard products I guess is the way to put it.

11         THE COURT:  Okay.

12         MR. VOWELL:  We believe -- again, at least at the

13   level the claims describe we believe they work the same way

14   because that is what their literature shows.

15         THE COURT:  Okay.

16         MR. VOWELL:  There are going to be implementation

17   differences between those products and the "n" compliant

18   products.

19         THE COURT:  Okay.  All right.  Anything else?

20         MR. VOWELL:  I think that is it at this time.

21         THE COURT:  Okay.  Let me have the defendant

22   respond, and I may want to hear again from you, Mr. Vowell.

23         MR. BURKE:  A couple of points let's -- you asked a

24   couple of good questions, various questions regarding the

25   nature of these products, Your Honor.  I think it is important

1   to recognize these products are largely backwardly compatible

2   with all of the earlier standards.  So just because a product

3   up there says it complies with draft "n" it also complies with

4   the earlier versions of the 802.11n.  So that would be like

5   "g" and "e" and et cetera.

6           So even though there may be a capability for a

7   device -- one of the accused products to work in that

8   particular mode, it may never actually be turned on by the

9   consumer.  And largely that is not so much a function of what

10  the consumer does.  It is a function of what other system

11  wants to talk, for instance, to that router.  So if you buy

12  one of those and you take it home -- which I actually did last

13  two weeks for my daughter and you plug it in and you want it

14  to take to a laptop, if the laptop is not an "n" compliant

15  card, that router will never talk to that laptop in the "n"

16  mode.  It will only talk to it in the "g" mode and or the

17  earlier modes.

18          So a lot of this is a function of how old the

19  devices are, how well it is working, et cetera.  The "n"

20  standard is particularly acute here because it is still in

21  some flux, it is still in draft form.  It has been going on

22  for almost four years now.  There are lots of things in this

23  500 pages, as Dr. Negus explained last week.  Some of it has

24  to deal with the MIMO stuff, but a lot of it has to do with

25  redesigning or suggesting other changes, you know, to stuff

1    that doesn't relate here.  So that is where if you look at the

2    answers of the two affidavits, Dr. Negus and Dr. Garodnick,

3    there was a disagreement about some features but they were

4    optional required.

5         As I understand the way the standard bodies work, if

6    it is not spelled out exactly, you know, that thou shall do

7    this, it is optional.  And if it is not mentioned, it is

8    optional.  You have to have, as I understand it, when these

9    industry groups get together, 75 percent approval.  So you can

10   imagine all of the horse-trading that goes on in these

11   standards committees to try to get something that 75 percent

12   of the people agree with.  It has changed four times just this

13   year.

14        Now, with respect to the one statement that their

15   expert Dr. Garodnick, who is sitting right here and also part

16   owner of the company, said that actually our independent

17   expert agreed with, is he said, "As in any standard the

18   specific implementation of the hardware, software, or

19   firmwares configurations in 802.11n is left to the designer."

20   That is not --

21        THE COURT:  Let me stop you.  I think what I am

22   going to need to do here is I need you to take a chart and

23   show me, give me an example of what you are talking about.  In

24   other words, point to me where there is a claim element and

25   they have accused the standard and how that is insufficient.

1   I feel like I am kind of groping around in the dark here.  I

2   think we need to get down to specifics.  Show me some

3   examples, and I want Mr. Vowell to respond.

4           MR. BURKE:  Let me see if I can get my --

5           THE COURT:  Okay.

6           MR. BURKE:  Do you have a copy of the --

7           THE COURT:  Well, I have a copy of -- you may have

8   to give me a copy.  I have, for example, in front of me I

9   think Belkin's -- the chart provided to Belkin.  But I'll look

10  at any of them that you have got that you have a problem

11  with.

12          MR. BURKE:  Although I represent Cisco-Linksys and

13  am most familiar with our products since you have a separate

14  copy of the Belkin, let me use that.  As I mentioned earlier,

15  all of the charts are the same.

16          THE COURT:  Okay.

17          MR. BURKE:  So I don't think there are any big --

18  any differences.  As a quick review there are four claims in

19  this case.  Some are alleged to be process claims, some are

20  system claims.  The part that probably is most egregious --

21  there is actually a couple of parts.  Let me look at the Claim

22  25, which is the apparatus claim.  I'm blessed with a number

23  of very smart co-Counsel that may have some better examples.

24  But, for example, Claim 25, which is a process claim --

25          Strike that.

1      Part of the process claim.  You have the elements
2   here on the receive side.  You have receiving the first
3   spread-spectrum signal and the second spread-spectrum signal
4   with a plurality of receiver antennas.  And you have the next
5   step which is the detection.  So once the signal arrives at
6   the antenna, it is detected and then there is actually two
7   separate combining operations.  Again, this is the receive
8   side of the claim, and all they say, for instance, there --
9   for instance, next to receiving is an 802.11n receiver.  And
10  they talk it has multiple antennas and the antennas are
11  coupled to receive the chain and accordingly one of the
12  multiple antennas receives each one of the multipath signals.
13      Now, I don't think they know that.  In fact, if I
14  am not mistaken one of the declarations of one of my brethren
15  here actually pointed out one of the antennas is turned off in
16  certain modes.  If you look here at the next one, the
17  detection part.  There I don't know what this means, to be
18  honest with you.  They talk about a demapper.  They talk about
19  an Nss spatial stream, they talk about OFDM signals.  I don't
20  know where they pulled that from, Your Honor.  I don't know if
21  it is from a textbook.  I don't know if it is from a technical
22  article.  I don't know.  If it is from the standard, I don't
23  know where in the standard or which version.
24      THE COURT:  What products are we talking about
25  here?  What does Belkin make?

1         MR. BURKE:  Belkin makes routers, correct?  Belkin's

2  counsel?

3         UNIDENTIFIED:  Correct.

4         MR. BURKE:  They make routers just like Cisco does.

5  But, again, they have the exact claim for the PC's.  But the

6  second part is that -- also there is a second part of

7  combining.  The reason I focused, Your Honor, on those is

8  because those are the differences between the traditional

9  spread-spectrum system and an OFDM system.  We don't think

10  they can map the two.  I know they can't do it with regard to

11  implementation details of the standard because it doesn't lay

12  it out, so I don't see how they get close in the apparatus

13  claim.  But we don't think they can do it theoretically at

14  this stage at all.  That is an example.  I am happy to --

15         THE COURT:  Okay.  All right.

16         MR. BURKE:  I didn't know if you want to ping

17  pong --

18         THE COURT:  Yeah.  Let's go -- Mr. Vowell, respond

19  to that.  Tell me how you are accusing a Belkin router that

20  this explains to them what you are saying is within the Belkin

21  wireless product, this is how it infringes these elements.

22         MR. VOWELL:  Okay.  So taking the specific example

23  from Claim 25 here and the receiving element of the claims,

24  receiving the first spread-spectrum signal and the second

25  spread-spectrum signal with a plurality of receiver antennas.

1  So we have recited how the Belkin product works by saying that

2  an 802.11n receiver includes multiple antennas, so 802.11n

3  describes the modes of operation in which multiple antennas

4  are used on the receiver.

5          THE COURT:  So you are saying in the receiving mode

6  of this router -- an 802.11n receiver includes multiple

7  antennas, so in the receiver mode of this router it includes

8  multiple antennas?

9          MR. VOWELL:  Yes.

10         THE COURT:  Okay.

11         MR. VOWELL:  Let me back up for a minute and also

12 mention that Belkin doesn't just make routers.  They make

13 routers that are sort of like the axis point, if you will,

14 that you would connect to with your laptop or whatever.  They

15 also make wireless cards that are meant to communicate with

16 the router.  So it is a card that would either be put into a

17 laptop through one of the PCMCIA slots or would somehow be

18 incorporated into a laptop or other client device.  So they

19 make a router and they make a card that talk to each other.

20         So going further, we cite additional information

21 here that says that each antenna is coupled to a receive

22 chain.  Now, we understand that the standard does not

23 explicitly say you have to have multiple receive chains.  It

24 doesn't explicitly say that.  But, again, we are not looking

25 at the standard in a vacuum.  We are looking at it in the eyes

1    of one of ordinary skill in the art that understands the

2    standard and understands how the devices communicate using the

3    standard.  So each of those routers has multiple antennas and

4    it has multiple receive chains to receive six spread-spectrum

5    signals over each of those antennas.  I'm happy to try to

6    unpack that for you a little bit because I can see you

7    scratching your head.

8              THE COURT:  You are saying so the router has each

9    antennas coupled to a receive chain and then each of the

10   multiple antennas of the receiver receives each of these

11   signals, including waveforms.  So you are saying that within

12   this -- are you saying all Belkin products that you have

13   accused here, this is within each of those products and this

14   is what you are saying infringes or matches up with the

15   receiving mode, I guess, or receiving element of the claim?

16             MR. VOWELL:  Yes, yes, Your Honor.

17             THE COURT:  Okay.  Mr. Burke, what is unclear about

18   that?

19             MR. BURKE:  With respect to the --

20             THE COURT:  Mr. Burke, you stay at counsel table

21   and, Mr. Vowell, you stay up there and we will go back and

22   forth here.

23             MR. BURKE:  I was actually looking at something

24   else.

25             THE COURT:  Remain standing, but just stand at

1    Counsel table.

2              MR. BURKE:  Having something to put my papers on

3    here.

4              THE COURT:  I understand.

5              MR. BURKE:  The problem that I have with this

6    analysis is it is circular.  I mean, we have a claim

7    limitation, you know, speaking to receiver, and all he does

8    over here on the right side is say 802.11n receiver and kind

9    of regurgitates that part of the claim language and comes back

10   around.  So he is talking about those skilled in the art.  I

11   think there needs to be an explanation in detail why that is

12   the case.  In particular the first and second spread-spectrum

13   signal.  You know, with regard to Belkin, I mean, just to give

14   you an example in the apparatus context, there are five

15   different manufacturers, chip manufacturers and their

16   products.

17             So I'm not sure as I sit here right now, Your Honor,

18   he gave me an explanation, I don't know what product he is

19   talking about.  If I were representing Belkin today, I would

20   not know what particular product he is saying is infringing

21   this claim.  He just mentioned adapters.  Also Belkin makes

22   routers like us.  I don't know what chip is performing this

23   step, and I don't have any materials supporting this.  So I

24   have nothing to go from except for him continuing to say they

25   know, they know, they know.

1          THE COURT:  Mr. Vowell, what would be wrong with

2     product by product first of all, and second of all saying

3     within Belkin product or Cisco product "X" the multiple

4     antennas that are included in the "n" standard are found here,

5     here, here, here, and here; then the chip that receives and

6     processes the signals over the multiple paths and all that

7     kind of stuff is found here, this is the chip we are talking

8     about, what would be wrong with that?

9          MR. VOWELL:  Well, the only concern I have is when

10    you say "found here," that is the problem.

11         THE COURT:  Okay.

12         MR. VOWELL:  Again, we are talking about electronic

13    circuitry and maybe in some cases software.  Antennas

14    obviously are hardware.  To point out here, the particular

15    device they handed you is sort of all in one device and the

16    antennas are smaller.  There are some devices you may have

17    seen somewhere.  I don't know if we put the picture in the

18    briefing for you, but little multiple, you know, antennas

19    about four or five inches long sticking out.  So in those

20    cases sure we can say here is the -- we can use a picture and

21    a couple of arrows and point to the antennas.

22         The point is that the notion of "here" is a little

23    more difficult in this context.  In some cases for some of

24    these elements, maybe not the receiver, but the demultiplexer,

25    it goes back to that Exhibit B I mentioned earlier, and that

1    is to say here when you have got a chip that is implementing a

2    number of functions and to point to the demultiplexer in

3    there, you can't really point to it.  It is physically there,

4    but we don't have the documents or the level of specificity to

5    be able to point to that.  I mean, it just makes it very

6    difficult.

7         THE COURT:  Okay.  Anything else?

8         MR. BURKE:  Yes.  Two points.  It is very difficult

9    if you don't try, if you don't gather and you don't do it.

10   And there is no evidence that they have, indeed, tried.  The

11   second part as I was looking through this received part,

12   again, the only time they use 802.11n, Your Honor, is as an

13   adjective there of receiver.  There is no identification of

14   the specific subsection which -- of the alleged 802.11n

15   receiver complies or doesn't, conforms to or doesn't, whether

16   it is an optional feature or required feature.  And even if

17   they went that far, Your Honor, there is no explanation why a

18   product that did it that way would satisfy the claim

19   limitation because the specification is not going to use this

20   type of language in it.  So they need to actually connect the

21   dots.

22        THE COURT:  All right.  What about the next one you

23   pointed out?  "Detecting at each receiver antenna of the

24   plurality of receiver antennas," what about that one, what is

25   wrong with that?

1     MR. BURKE:  Well, again, Your Honor, they haven't --
2  they have kind of thrown around some catch phrases like OFDM.
3  They have provided a discussion that looks mathematical or
4  somewhat detailed.  I mean it is Nss spatial streams contain a
5  first complex number stream.  I mean, I would like to know
6  where they have pulled this information from.  Why do they
7  think that?

8     They have at the bottom here a demapper, demap via a
9  plurality of demappers.  Now, I have asked our experts, I have
10  asked our in-house people.  Nobody seems to know exactly what
11  a demapper is.  More or less they haven't explained how a
12  demapper satisfies this detection on the left-hand side.

13     The part that is really problematic here for them --
14  and if I can find the exact language.  We have two, quote
15  unquote, spread-spectrum signals.  This is the claim -- I
16  think we talk about subchannels at some point here.  And that
17  is the part that is -- that doesn't quite square up with the
18  OFDM type system.  This actual element doesn't have it.  That
19  is not part of the same context that there is two signals.

20     THE COURT:  Okay.  Mr. Vowell, one question he has
21  about this is where does it come from?  Where are you getting
22  this language?

23     MR. VOWELL:  Specifically the language about the
24  signals is coming directly from the standard because even as
25  their own experts admit, the standard itself describes the

1    waveforms that are being transmitted.  It describes

2    mathematically how those waveforms are created and

3    transmitted.  And, again, since we are receiving those same

4    waveforms they know that from the standard.  We also know that

5    the standard describes that these signals were processed using

6    Orthogonal Frequency-Division Multiplexing, or OFDM, because

7    of that we know that in order to receive this signal, you have

8    to have the basic components to an OFDM receiver, including

9    the demappers.

10        While we are here and since this is one of the

11    issues that has been brought up a couple of times, this

12    concept of OFDM not being a spread-spectrum technique is a red

13    herring.  I have a document sitting here that was produced by

14    Cisco that calls OFDM and spread-spectrum technique.  I can't

15    show it to my client because they have marked it as attorneys'

16    eyes only, but I could bring it up and show it to you and put

17    this issue to rest.  There is just no basis for them making

18    that argument at this point and trying to put out the

19    distinctions between OFDM and spread spectrum or trying to

20    impute that to our claim construction -- or, excuse me, to our

21    infringement contentions.

22        THE COURT:  Well, you know, I guess again, Mr.

23    Vowell, though, it seems as if what they are saying is they

24    don't know -- you say this is occurring, this first one of Nss

25    spatial streams containing this, a second one containing this,

1    but where is that found in the product?

2         MR. VOWELL:  It is found in these blocks or in these

3    chips.  Again, it was Exhibit C that they attached that in

4    order to point to it, okay, we would have to have a block

5    diagram probably from the chipset manufacturer.  But if you

6    are going to process -- I mean it follows that if you have

7    done this process on the transmitter and you are going to

8    receive and actually use those incoming signals that were

9    processed using OFDM and we know that -- and another thing we

10   know is that these product manufacturers have had their

11   products tested by this independent third party, Wi-Fi

12   Alliance, to certify that they are compliant with that.  And

13   because they have passed those tests and because we know they

14   have tested them, then we know they work this way.  That

15   particular alliance actually requires that they comply with

16   some of the optional parts of the standard as well as just the

17   mandatory portions.

18        THE COURT:  Okay.  Anything on that element or any

19   other elements you want to point out or anybody wants to point

20   out?  Speak now or forever hold your peace.

21        MR. BURKE:  One point, here again, and I am just

22   looking at the materials -- I am happy to provide them to

23   you -- with regard to Dr. Negus.  This is a product circular

24   that was attached to his declaration.  If I can approach I can

25   show you, Your Honor.

1          THE COURT:  Okay.

2          MR. VOWELL:  Sure.

3          MR. BURKE:  This is a couple of pages here.  If you

4     look there, there is a system diagram at least at a high

5     level, at a very high level.  I don't want to suggest, Your

6     Honor, that is a detailed specification.  We also look --

7     there is Wi papers that are out there.  Excuse me, Mr.

8     Vowell.

9          THE COURT:  So this is a Broadcom chip sheet?

10          MR. BURKE:  Chip sheet product circular.  Your

11     Honor, that was found in about 15 minutes.  Once you open it

12     up, you go to the Broadcom website, you type in the number,

13     that pops up.  If you actually go into Google, Your Honor, and

14     you type the 802.11n in draft version, one of the first things

15     that pops up is a Broadcom Wi paper.  It is a little bit

16     dated.  It is April 2006.  But it discusses the standard.  It

17     has charts, has explanations, it has consumer applications, a

18     whole host of things.  You may find it interesting that on

19     Page 5 of that it actually lists the features that Your Honor

20     asked about in his order.  In fact, it is in almost the same

21     order.

22          Now, again, this is somewhat dated.  I am not sure

23     how accurate it is today, but this is put out by Broadcom --

24     not by Cisco but by Broadcom -- about the 802.11 standard and

25     their products.  I asked my secretary yesterday to print out

1    materials that were just referenced by the defendants, you

2    know, a small amount of time.  This is it.  That doesn't even

3    speak to the source code, which apparently I didn't even know

4    this, the source code is available publicly on some of these

5    websites that some of the defendants spelled out.

6            So I am happy to hand you all of this, but this is

7    just the data that is on the web at all of these defendants'

8    websites or their suppliers.  So when Mr. Vowell says he can't

9    find it or he doesn't know, I wonder how hard they've really

10   looked.

11           THE COURT:  Mr. Vowell, are you going to subpoena

12   these chip manufacturers?

13           MR. VOWELL:  Yes, Your Honor.

14           THE COURT:  Okay.  Well, any other elements here

15   that anyone wants to point out so I can get a grasp on what is

16   insufficient about the -- or what is allegedly insufficient

17   about the contentions?  Anything else from -- Mr. Burke?

18           MR. BURKE:  Yeah.  Yes, sir, Your Honor.  One point

19   I beg your patience here, some of the words, you know, change

20   throughout their claims.  They have this first and second

21   spread-spectrum signal.  In other cases they talk about -- I

22   think they call it -- I am looking now at Claim 33.  They call

23   it the spread-spectrum subchannel signals.  That is what is,

24   you know, going to be different in an OFDM style system --

25           THE COURT:  So tell me what it is they interchange

1    and point out where it is on the chart.

2            MR. BURKE:  It is in a couple of places, Your Honor.

3    I look here at Claim 33 of the '322 patent.  And this is

4    actually a system claim that has been represented as such.  We

5    have a plurality of spread-spectrum devices for

6    spread-spectrum processing, a plurality of subchannels of

7    data.  Now, the reason that is important is because these are

8    spread-spectrum-type terms, not OFDM-type terms and,

9    therefore --

10           THE COURT:  Let me stop you there.  Their

11   contentions is OFDM, spread spectrum, it doesn't matter.  Now,

12   I mean, that is just their position.  What do you want me to

13   do about that?

14           MR. BURKE:  I don't think that they should just be

15   able to say it doesn't matter and stop.  I think, Your Honor,

16   they need to explain --

17           THE COURT:  Explain how an OFDM --

18           MR. BURKE:  System.

19           THE COURT:  Can encompass or match?

20           MR. BURKE:  Step one --

21           THE COURT:  Spread spectrum.

22           MR. BURKE:  Spread spectrum.  Your Honor, It is

23   particularly important here this OFDM was around when Dr.

24   Schilling filed for his patent.  If you look at the particular

25   architecture in the figures, it is all traditional

1    spread-spectrum-type architecture.  It only became popular now

2    when they started doing this OFDM in MIMO in relation to the

3    "n" standard.  In fact, you asked a question earlier I'd like

4    to come back to.  You asked about MIMO and how important it

5    is.  MIMO has kind of become in this area kind of the

6    adjective everybody wants to say.  It is like saying "Tastes

7    great, less filling" or something.  It is a slogan.  It has

8    become a popular industry term that gets thrown around a lot

9    now and -- because of certain advantages.

10        They didn't even use the term until six years after

11   they filed for their patent -- or eight years after.  It is

12   not in their original patent as originally filed.  So it is a

13   very important question.  Unfortunately, I am not sure their

14   patent is able to help us very much.  We need to at least

15   understand how they are applying it with respect to our

16   products.

17        THE COURT:  Okay.  So that is that issue.  Mr.

18   Vowell, let me just mention, you mentioned that you have a

19   document that says they are the same.  I mean, would it be

20   helpful to point to that document and explain how they match

21   up.

22        MR. VOWELL:  Well, the document itself doesn't go in

23   detail and explain it.  And I will point out that on this

24   issue we sent an interrogatory to the defendants asking them

25   to explain why they contend OFDM is not spread spectrum, and

1    they declined to answer that saying that is a matter for

2    expert testimony, an expert opinion.  And that is what -- we

3    agree with them.  And that is why -- we certainly don't think

4    it is necessary for the preliminary infringement contentions

5    or infringement contentions.  We are happy to do that through

6    expert reports and testimony.

7              THE COURT:  All right.  I interrupted you, I think.

8    You were going to make a point about this -- you were citing

9    the element of plurality of spread-spectrum devices.

10             MR. BURKE:  Yes, sir.

11             THE COURT:  And you were going to make a point that

12   they changed their --

13             MR. BURKE:  It is the --

14             THE COURT:  -- terms.

15             MR. BURKE:  Your Honor, if I could -- I am doing

16   this on the fly.  But we have a plurality of spread-spectrum

17   subchannel signals.  That is going to become a key issue --

18   or could become a key issue depending upon what their

19   contention is.  Again, they haven't explained how it is that

20   an OFDM-style system satisfies that on the right side.  I

21   mean, they talk about constellation mappers.  They talk about,

22   how, you know, it provides constellation points.  I mean they

23   haven't done the side-by-side comparison in this discussion.

24   And, again, I don't know if this applies -- I have got to

25   repeat myself.  It goes back to this "n" standard.  I don't

1    know where they are getting it from.  I don't know what

2    products.  I don't know if some products work differently than

3    other products.  They haven't made an effort to find that

4    out.

5         So we are -- the last point, Your Honor -- I'm

6    sorry.  I will stop here and let him respond if --

7         THE COURT:  No, go ahead.  You have something else

8    you wanted to say?

9         MR. BURKE:  Yes, sir, I do.  Again, I don't know

10   where you are going with this; but the part that has us

11   little bit, honestly, frightened right now is, again, a week

12   from Friday we are supposed to swap claim terms.  We have had

13   to so far conduct all of our prior art searches, you know,

14   collect whatever we can in terms of the documents at least in

15   our mind not having a good understanding of what this case is

16   all about.  We have lost a lot of time in that regard.

17        We feel a little bit like we are trying to do their

18   job for them.  I don't know, again, where Your Honor is

19   heading with this.  But I don't think it is right to make the

20   defendants go forward with a Markman construction, with a

21   hearing, with a brief until we have the issues crystallized

22   the parties between us as well as for Your Honor.  Otherwise,

23   I am a little afraid we are kind of feeling around here in the

24   dark.

25        THE COURT:  Well, we are going ahead with the

1    Markman Hearing January 15th.  There is no doubt about that.

2          THE COURT:  This case is -- there is no --

3    absolutely no reason why an '07 case can't have a Markman

4    Hearing in '09, so we are going forward with it.  Now, we may

5    talk about some moving of some deadlines here in a moment, but

6    we are having the hearing on the 15th.

7          Now, Mr. Vowell did you want to say something about

8    his specific reference of this element that talks about

9    constellation mappers, constellation points?

10         MR. VOWELL:  I would just point out, Your Honor,

11    that some of the issues that are being raised here are really

12    claim construction issues, what they are getting into.  We

13    don't understand how they are construing this or whatever.

14    That will become clear through the Markman process.  But we

15    have pretty clearly laid out what the subchannels of data

16    are.  That is the multiple spatial streams, the

17    spread-spectrum processing we have equated to what is

18    happening with OFDM.  We have given a pretty detailed

19    recitation of how the standard describes that on the

20    transmission side.  So it is pretty clear to us we have

21    provided probably more detail than was necessary on this

22    particular element at least to put them on notice what we

23    think meets that claim limitation.

24         THE COURT:  All right.  Does any other defendant

25    want to point something out?

 1          MR. RANGE:  I have a couple of minor points, Your

 2    Honor.

 3          THE COURT:  All right.

 4          MR. RANGE:  First, with respect --

 5          THE COURT:  For the record, this is Mister --

 6          MR. RANGE:  Yeah, I'm Mr. Brian Range.  I'm

 7    representing Netgear today.

 8          THE COURT:  All right.  Go ahead.

 9          MR. RANGE:  I'm sorry.  With respect to the things

10    that do not satisfy the 802.11n standard but they accused as

11    being MIMO products, they said the literature indicated to

12    them that the products work the same way as 802.11n.  I think

13    we are entitled to know what literature they are looking at

14    and why they think that.  And really if they think -- if it is

15    their contention that all MIMO satisfies this patent, then

16    they should let us know that because we make a great

17    invalidity case if that is the case.  Because MIMO has existed

18    long before their patent.

19          But if it is not all MIMO we need to know that too

20    so we can decide where is the noninfringement arguments and so

21    forth.  This goes back to Mr. Burke's point that we are trying

22    to litigate in the dark here.

23          Second, kind of a more overarching point is if these

24    contentions are allowed to stand, I fear that they are going

25    to be the model for all plaintiffs going forward.  Mr. Burke

1    represents a lot of plaintiffs; and if I were him, I would

2    say, well, it looks like I have been paying too much detail on

3    these things.  I can pretty much make a circular argument

4    saying all the accused things satisfy the claim elements.  I

5    don't need to say particular products meet particular elements

6    in this way, save me a lot of work, leave me a lot more

7    flexibility down the road and let the defense litigate in the

8    dark.  I don't think it is good for the industry.  That's all

9    I have, Your Honor.

10          THE COURT:  Mr. Vowell, do you want to respond to

11   that?

12          MR. VOWELL:  Just briefly, Your Honor, just to point

13   out that I don't know what all of the references are to MIMO

14   technology that are out there.  I know that we looked at the

15   specific ones that were involved in this case or the products

16   in this case and looked at what the literature said with

17   regard to those products.  So that is what we relied on.  I

18   don't know what other uses of MIMO there have been, whether

19   those are consistent with our understanding of that term, but

20   to just say --

21          THE COURT:  So you are not saying you are accusing

22   these products because they use MIMO technology?

23          MR. VOWELL:  We are saying that, but it is because

24   they use MIMO and they use it in the way that is described in

25   the claims.

1        THE COURT:  So the patent in your mind teaches a
2   certain configuration of MIMO technology?

3        MR. VOWELL:  Yes.

4        THE COURT:  And these products that you are
5   accusing, the same thing they utilize MIMO technology in a
6   certain configuration that is claimed in the patent?

7        MR. VOWELL:  That's correct.

8        THE COURT:  Any other defendant want to make any
9   points here before we conclude?

10        All right.  What I am going to do is take your
11   arguments under advisement and look at this, and I will make
12   my ruling hopefully very soon.  And what I will do is look at
13   your deadlines, and I may make according adjustments based on
14   what I decide to do.

15        Again, your Markman Hearing is not going to move.  I
16   will say this, as I indicated, for this case to have been
17   filed in '07 and y'all to have been given until January 15th
18   '09 for a Markman Hearing, that is a lot longer than I like;
19   and, you know, we are kind of late in the game to be
20   addressing all these issues.  You know, I don't know that,
21   perhaps, nothing could have been done to iron this out sooner,
22   but certainly it needs to get ironed out.  We need to move
23   forward.  And you are going to have your hearing, and you are
24   going to get on down the road in this case.  It really needs
25   to be moved along and get past these issues we are dealing

1   with here today in September when the case -- I don't know

2   when it was filed; probably mid-2007.

3          All right.  Anything further from plaintiff at this

4   time?

5          MR. VOWELL:  No, Your Honor.

6          THE COURT:  Anything further from either of the

7   defendants?

8          MR. BURKE:  No, Your Honor.

9          THE COURT:  All right.  Thank you very much for your

10  arguments, and we are adjourned.

11       (End of hearing.)

12

13

14              C E R T I F I C A T I O N

15

16  I certify that the foregoing is a correct transcript from the

17  record of proceedings in the above-entitled matter.

18

19

20  /s/

21  SHEA SLOAN, CSR, RPR
    OFFICIAL COURT REPORTER
22  STATE OF TEXAS NO. 3081

23

24

25